**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____

|  |  |  |
|---|---|---|
| **WILLIAM A. GRAHAM COMPANY,** | : | |
| **d/b/a THE GRAHAM COMPANY,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **CIVIL ACTION NO.  05-cv-612-HB** |
| | : | |
| **THOMAS P. HAUGHEY, an individual,** | : | |
| **and USI MIDATLANTIC, INC., a** | : | |
| **corporation,** | : | |
| | : | |
| **Defendants.** | : | |
| | : | |

_____

## ORDER

AND NOW, this _____ day of _____, 2007, upon consideration of

Plaintiff's Pretrial Motion Concerning the Proper Scope of Jury Issues and Trial Presentations

for the Second Damages Trial, and defendants' opposition thereto, it is hereby ORDERED that

the MOTION is GRANTED.

It is further ORDERED that the issues for jury determination at the second trial in this

action shall be limited to the determination of the total amount of each defendant's gross

revenues for copyright infringements occurring after February 8, 2002.

BY THE COURT:


_____

HARVEY BARTLE III, J.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| WILLIAM A. GRAHAM COMPANY,<br>d/b/a THE GRAHAM COMPANY, | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| v. | : | CIVIL ACTION NO. 05-cv-612-HB |
| | : | |
| THOMAS P. HAUGHEY, an individual,<br>and USI MIDATLANTIC, INC., a<br>corporation, | : | |
| | : | |
| **Defendants.** | : | |
| | : | |

**PLAINTIFF'S PRETRIAL MOTION CONCERNING THE PROPER SCOPE OF**
**JURY ISSUES AND TRIAL PRESENTATIONS FOR THE SECOND DAMAGES TRIAL**

Plaintiff William A. Graham Company ("The Graham Company"), in accordance with

paragraph 2 of this Court's Sixth Scheduling Order entered on June 5, 2007 (D.I. 198),

respectfully moves the Court for an order limiting the issues for jury determination at the second

trial ordered by this Court on November 21, 2006 (D.I. 161) to the determination of the total

amount of each defendant's gross revenues for copyright infringements occurring after February

8, 2002. The basis for this motion is set forth in the accompanying memorandum of law, which

is incorporated herein by reference.

Respectfully submitted,

Dated: July 10, 2007          By:     /s/ David J. Wolfsohn
David J. Wolfsohn (Atty. ID # 57974)
Aleksander J. Goranin (Atty. ID # 92452)
Cira Centre, 12th Floor
2929 Arch Street
Philadelphia, PA 19104
(215) 568-3100

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **WILLIAM A. GRAHAM COMPANY, d/b/a THE GRAHAM COMPANY,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **CIVIL ACTION NO. 05-cv-612-HB** |
| | : | |
| **THOMAS P. HAUGHEY, an individual, and USI MIDATLANTIC, INC., a corporation,** | : | |
| | : | |
| **Defendants.** | : | |
| | : | |

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF
## ITS PRETRIAL MOTION CONCERNING THE PROPER SCOPE OF
## JURY ISSUES AND TRIAL PRESENTATIONS FOR THE SECOND DAMAGES TRIAL

David J. Wolfsohn (Atty. ID # 57974)
Aleksander J. Goranin (Atty. ID # 92452)
WOODCOCK WASHBURN LLP
Cira Centre, 12th Floor
2929 Arch Street
Philadelphia, PA 19104
(215) 568-3100

Attorneys for Plaintiff

Dated: July 10, 2007

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

RELEVANT FACTS AND PROCEDURAL BACKGROUND ................................................. 6

    A.    The Jury Instructions ........................................................................................ 6

    B.    The Graham Company's Damages Evidence at the First Trial ............................. 8

    C.    The Defendants' Damages Evidence at the First Trial ........................................ 8

    D.    The Graham Company's Closing Argument on Damages .................................. 11

    E.    The Defendants' Closing Argument on Damages .............................................. 13

    F.    The Jury's Verdict .......................................................................................... 15

    G.    Post-trial Motions and Briefing ....................................................................... 16

    H.    Summary of Section 504(b) Calculations ......................................................... 18

ARGUMENT .................................................................................................................... 19

I.    The First Jury Has Already Decided Section 504(b)'s "Deductible Costs" and "Apportionment" Offsets for All Proposals, Including the Ones in the Post-February 2002 Period ...................................................................................... 19

II.    A Second Jury Deciding Certain Section 504(b) Damages Issues Should Be Constrained By the First Jury's Determinations ................................................. 25

    A.    The Reexamination Clause Precludes a Second Jury From Re-Trying Issues Already Decided by a First One .............................................................. 26

    B.    The Second Jury on Re-Trial Should Be Asked to Decide Only the Amount of *Gross Revenues* for the Post-February 2002 Period .......................... 29

    C.    Defendants Should Not Be Permitted to Bolster Their "Apportionment" Arguments and Evidence at the Damages Re-trial ............................................. 30

III.    Defendants Should Not Be Permitted to Bolster Their Case on "Deductible Costs" ....... 31

CONCLUSION .................................................................................................................. 33

# TABLE OF AUTHORITIES

**Case Law**

*Allen Organ Co. v. Kimball International, Inc.*,
   839 F.2d 1556 (Fed. Cir. 1988)......................................................................25

*Anastasio v. Schering Corp.*,
   838 F.2d 701 (3d Cir. 1988).........................................................................24

*Bingham v. Zolt*,
   66 F.3d 553 (2d Cir. 1995)...........................................................................25

*Blyden v. Mancusi*,
   186 F.3d 252 (2d Cir. 1999)................................................................. *passim*

*Cleveland v. Piper Aircraft Corp.*,
   985 F.2d 1438 (10th Cir. 1993) ................................................................2, 32

*Crane v. Consolidated Rail Corp.*,
   731 F.2d 1042 (2d Cir. 1984).................................................................26, 27

*Davis v. Omitowoju*,
   883 F.2d 1155 (3d Cir. 1989)..................................................................27, 28

*Frank Music Corp. v. Metropolitan-Goldwyn-Mayer*,
   772 F.2d 505 (9th Cir. 1985) ..........................................................................2

*Freeman v. Chicago Park District*,
   189 F.3d 613 (7th Cir. 1999) ..................................................................27, 30

*Gallimore v. Missouri Pacific R.R. Co.*,
   635 F.2d 1165 (5th Cir. 1981) ......................................................................25

*Gasperini v. Ctr. for Humanities*,
   518 U.S. 415 (1996).................................................................................26, 27

*Greenhaw v. Lubbock Cty. Bev. Association*,
   721 F.2d 1019 (5th Cir. 1983) ........................................................27, 30, 31

*Griffin v. Matherne*,
   471 F.2d 911 (5th Cir. 1973) ........................................................................25

*In re Lower Lake Erie Iron Ore Antitrust Litigation*,
   998 F.2d 1144 (3d Cir. 1993)............................................................... *passim*

*Martin's Herend Imports, Inc. v. Diamond Gem Trading United States Co.*,
    195 F.3d 765 (5th Cir. 1999) ......................................................................32

*In re Rhone-Poulenc Rorer, Inc.*,
    51 F.3d 1293 (7th Cir. 1995) ...............................................................26, 29

*Riley v. Kmart Corp.*,
    864 F.2d 1049 (3d Cir. 1988)......................................................................25

*Royal Cup, Inc. v. Jenkins Coffee Service, Inc.*,
    898 F.2d 1514 (11th Cir. 1990) ........................................................ *passim*

*Skinner v. Total Petroleum, Inc.*,
    859 F.2d 1439 (10th Cir. 1988) ..................................................................26

*Strauss v. Springer*,
    817 F. Supp. 1211 (E.D. Pa. 1992) ............................................................25

*Total Containment, Inc. v. Dayco Products, Inc.*,
    177 F. Supp. 2d 332 (E.D. Pa. 2001) ...................................................32, 34

*U.S. v. 0.78 Acres of Land*,
    81 F.R.D. 618 (E.D. Pa. 1979), *aff'd without op*, 609 F.2d 504 (3d Cir. 1979)...........25

*United States v. Urban*,
    404 F.3d 754 (3d Cir. 2005)........................................................................21

*Willard v. The John Hayward*,
    577 F.2d 1009 (5th Cir. 1978) ...............................................................5, 24

## Federal Statutes and Rules

    17 U.S.C. § 504(b) ........................................................................... *passim*

    Fed. R. Civ. P. 59.........................................................................................29

## Other Authorities

    U.S. Constit. Amend. VII............................................................... *passim*

    11 Charles Alan Wright et al., Federal Practice & Procedure
        Civil 2d § 2803......................................................................................2, 32

    Patrick Woolley, Mass Tort Litigation and the Seventh Amendment
        Reexamination Clause, 83 Iowa L. Rev. 499 (1998)..................................26

## INTRODUCTION[1]

Through this motion, plaintiff William A. Graham Company ("The Graham Company") addresses the proper scope of the damages-related factual issues that should be submitted for a second jury's determination, following this Court's prior rulings ordering a re-trial of damages. Both constitutional and procedural law impose important constraints on what a second jury in this case is permitted to decide with regard to these damages-related factual issues, and what evidence may be fairly presented in support of them.

The constitutional constraint arises from the Seventh Amendment and its Reexamination Clause, which provides that "a given issue may not be tried by different, successive juries." *Blyden v. Mancusi*, 186 F.3d 252, 268 (2d Cir. 1999). When, as in this case, a second jury potentially would be asked to re-decide issues that a prior jury has already determined, Reexamination Clause concerns come to the front and center. Indeed, in the recent *In re Lower Lake Erie Iron Ore Antitrust Litigation* decision, the Third Circuit reversed a district court, holding that the Reexamination Clause was violated when the defendants were permitted at a second trial to re-argue damages causation issues already decided by a first jury at a first trial. 998 F.2d 1144, 1182-83 (3d Cir. 1993) (Mansmann, J.). This Reexamination Clause jurisprudence defines in large part what specific damages-related issues a second jury may *not* be asked to decide in this case.

Aside from the Seventh Amendment dimension, the damages re-trial also raises fundamental fairness concerns that preclude the defendants, USI MidAtlantic and Thomas P. Haughey, from exploiting the re-trial as a chance to introduce new evidence and/or theories in an effort to improve their case, despite the fact that they had every opportunity to present their best

---

[1] At the June 4, 2007 status conference in this case (D.I. 197), the Court, after discussion with the parties, permitted each side to file briefs in support of their pretrial motions in excess of the 25-page limit set forth in the Court's Policies and Procedures.

1

case on the issues at the first damages trial. Courts frown upon attempts to use a second trial as an opportunity "to 'plug the holes' of a case" unsuccessfully presented at the first trial, *Cleveland v. Piper Aircraft Corp.*, 985 F.2d 1438, 1450 (10th Cir. 1993), and that concern is directly implicated here. *See also* 11 Charles Alan Wright et al., Federal Practice & Procedure Civil 2d § 2803, at 50 (in the new trial context, "[d]ecisions respecting the admission of additional witnesses and proof should be guided by considerations of fairness and justice to all parties").

These important Seventh Amendment and fairness principles are implicated because of the procedural history of this case and the underlying statutory provision that governs damages, Section 504(b) of the Copyright Act. Section 504(b) sets out a three-step formula for arriving at a final infringer profit figure. As a first step, the copyright owner submits evidence of "the infringer's gross revenue." 17 U.S.C. § 504(b). For the second step, the burden then shifts to the defendant to prove up the "deductible expenses" associated with generating that revenue. *Id.* Lastly, for the third step, the burden remains on the infringer to offer evidence of "elements of profit attributable to factors other than the copyrighted work." *Id.* Courts frequently refer to this third step as the "apportionment" of profits. *See, e.g.*, *Frank Music Corp. v. Metro-Goldwyn-Mayer*, 772 F.2d 505, 518 (9th Cir. 1985) ("when an infringer's profits are attributable to factors in addition to use of [its] work, an apportionment of profits is proper").

A first trial in this case was held in June 2006, and the evidence proved a 14-year period of thousands of instances of copyright infringement by defendants from July 1992 through June 2005. The first jury adjudicated not only USI MidAtlantic's and Haughey's liability for these infringements – finding them both liable – but it also was asked to determine damages. Under Section 504(b), the damages question before the first jury was what "profits of the infringer," 17 U.S.C. § 504(b), the defendants had received from their long series of copyright violations. In

2

other words, the first jury was asked to apply Section 504(b)'s three-step formula to arrive at a "profits" figure for the 1992-2005 infringement period, and it did so, awarding $16,561,230 in damages against USI MidAtlantic and $2,297,397 in damages against Haughey.

Before the first jury reached its conclusion about Section 504(b) profits, defendants had every opportunity to attempt to prove their case regarding the statutory offsets that defendants were claiming – for "deductible expenses" (step 2 of the three-step formula) and "apportionment" (step 3). Importantly, virtually all of the defendants' arguments were universal, generic ones – arguments that applied across-the-board to any and all of the infringing insurance proposals that were before the first jury. The defendants broadly argued, for instance, that none of the defendants' profits, on any of the 1992-2005 proposals, were attributable to defendants' infringement – *i.e.*, that the jury should apportion 0% to the infringement. This was because, according to defendants, the actual language used in any written proposal was not important, and other factors unrelated to infringement – like premium costs, and the interpersonal and sales skills of USI MidAtlantic's producers – were what actually drove the defendants' customers to buy insurance from them. Ex. A, Trial Tr. Day V (defense closing)*,* at 86:14-17, 88:23-89:17, 90:11-24.

Following the entry of judgment on the first jury's verdict, the defendants sought a re-trial of the jury's Section 504(b) damages analysis, arguing that the first jury had erred in their apportionment decision. This Court expressly declined to rule on this new trial request. D.I. 161, Nov. 21, 2006 Mem. Op., at 34-35. Rather, the Court ordered a new trial on an altogether different ground argued by defendants – that the jury's decision in The Graham Company's favor on the statute of limitations defense was not supported by the evidence. *Id.* at 34. Several months later, this Court granted another motion by defendants directed to the statute of

limitations, entering partial summary judgment against The Graham Company on that defense. D.I. 188, Mar. 29, 2007 Mem. Op. at 28.

The ultimate impact of the Court's two statute-of-limitations rulings is that only one piece of the first damages case should be re-tried. With the grant of partial summary judgment, this Court has ruled that any recovery for copyright infringements occurring prior to February 9, 2002 is time-barred. However, The Graham Company can still recover under Section 504(b) for infringements occurring between February 9, 2002 and June 2005, the date of the last infringing proposal presented at the first trial.[2]

The Seventh Amendment and fairness concerns that this procedural posture raises are properly framed as follows. The first jury decided all Section 504(b) factual issues with regard to the entire universe of 1992-2005 infringing proposals – that is, it decided the amount of "gross revenues" (step 1 of Section 504(b)'s three-step formula); the amount of "deductible expenses" (step 2); and the appropriate amount of "apportionment" (step 3). A second jury, because of the statute of limitations rulings in this case, will be charged with deciding certain Section 504(b) factual issues with regard to a subset of that entire universe of infringing proposals – just the 2002-2005 infringing proposals. Those 2002-2005 proposals, however, were all before the first jury when it performed its Section 504(b) analysis, and as defendants were making their broad, generic arguments that _all_ proposals, as a universal matter, were irrelevant to defendants' bottom-line profits. Thus, the principal question addressed by this motion is: In light of the Seventh Amendment's Reexamination Clause and the case law, what Section 504(b) issue is properly open for the second jury's decision?

---

[2]     _See_ D.I. 188, Mar. 29, 2007 Mem. Op. at 28 ("The three year statute of limitations set forth in the Copyright Act bars all of Graham's claims against defendants that accrued prior to February 9, 2002. Graham, of course, will still be able to recover defendants' profits arising from acts of infringement occurring on or after that date."). Of course, plaintiff respectfully disagrees with this ruling, and nothing said in this motion or otherwise by plaintiff should be construed as agreement with that ruling.

Reexamination Clause jurisprudence and fairness concerns require that only one, narrow

factual issue be presented to the second jury: the amount of each defendant's "gross revenues" for

infringements occurring after February 8, 2002.  In other words, the second jury needs only to

perform the first step – the "gross revenue" step – of Section 504(b)'s three-step formula, and only

as to the 2002-2005 infringing proposals, the narrowed subset of the entire universe of 1992-2005

infringing proposals presented to and ruled on by the first jury.  The first jury never specifically

determined the pool of "gross revenues" attributable to this narrowed subset alone, and so no

Seventh Amendment reexamination concerns are implicated by having a second jury find that fact.

But, in terms of the other two steps of the Section 504(b) formula – the offsets for "deductible

expenses" and "apportionment" – the situation is markedly different.  Given the evidence and

arguments at the first trial, and especially given the broad, generic  nature of the defendants'

Section 504(b) presentation – virtually every one of their arguments was applicable to every single

infringing proposal, both within the 2002-2005 time period and outside of it – it is only fair and

logical to conclude that the first jury already decided the appropriate amount (easily calculated) by

which to reduce "gross revenues" to account for "deductible expenses" and "apportionment."[3]

The scope of the second trial, fairly and logically, should be narrow and limited.  In

effect, the second jury would be asked to answer a single interrogatory – What is the total

amount of each defendant's _gross revenues_ for their infringements occurring after February 8,

2002?  In all likelihood, The Graham Company would need to call only one witness, Dr. Richard

Gering, to present the "gross revenue" pool for the narrower 2002-2005 subset of infringing

---

[3]      When evaluating what a jury expressly or impliedly determined in reaching a verdict, courts look
to what a jury "logically" or "probably" decided.  _See, e.g._, _Willard v. The John Hayward_, 577 F.2d 1009,
1010 (5th Cir. 1978) (holding that courts examining a jury's answer should look to what the "logical and
probable decision" reached was).  Moreover, courts undertake this analysis by looking at the entire trial
record, including "evidence, argument, [and] jury instructions."  _Royal Cup, Inc. v. Jenkins Coffee
Service, Inc._, 898 F.2d 1514, 1521 (11th Cir. 1990).

proposals – a subset of the revenue information contained in Dr. Gering's earlier expert reports.

In fact, the defendants likely would take no issue with Dr. Gering's calculations (since they took

no issue with them in the first trial), in which case the parties may even be able to stipulate to a

figure, and avoid the need to impanel a jury.  The remaining two steps of Section 504(b)'s three-

step formula should be performed directly by the Court.  The Court should take the first jury's

"gross revenue" finding, apply the "deductible expense" and "apportionment offset" percentages

found by the first jury, and enter a final judgment for the appropriate bottom-line profit amount.

Defendants are not now permitted to re-try these jury findings, particularly since the Court has

not disturbed them in any of its post-trial rulings.  This approach is the most reasonable and

practical one given the significant restrictions on re-trial imposed by the Seventh Amendment's

Reexamination Clause and by basic considerations of fairness.

<b><u>RELEVANT FACTS AND PROCEDURAL BACKGROUND</u>[4]</b>

    **A.**    **The Jury Instructions**

This Court, in thorough and proper instructions, explained to the first jury at the first trial

the three-step Section 504(b) formula it was to apply in determining damages.[5]  The defendants

had no objection to these instructions.  Ex. A, Trial Tr. Day V, at 123:8-124:1.[6]

---

[4]    The recitation of this background is thorough because a major question relevant to this motion is what the first jury, at the first trial, logically and probably decided with regard to Section 504(b).  The pertinent case law teaches that that question is resolved by looking at the entire record of the trial, including the "evidence, argument, [and] jury instructions."  *Royal Cup*, 898 F.2d at 1521.

[5]    Section 504(b) states in full:

> The copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages.  In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work.

With respect to the first step of the 504(b) formula, the Court instructed that "plaintiff is first required to prove by a preponderance of the evidence the defendants' 'gross revenue reasonably related to the infringement.'" Ex. B, Jury Instructions, at ¶ 66. The Court explained that USI MidAtlantic's gross revenues were "the dollar amount of commissions it earned that can be attributed to the use of proposals containing infringing material," and that, similarly, Thomas Haughey's gross revenues were "the dollar amount of commissions he earned that can be attributed to the use of proposals containing infringing material." *Id.*

The Court then proceeded to instruct on Section 504(b)'s second step – "deductible expenses" or "deductible costs."[7] *Id.* at ¶ 67. The Court explained that the deductible cost calculation for USI MidAtlantic, a company, would be different than that for Haughey, an individual. Specifically, the Court stated that USI MidAtlantic was entitled to an offset for "commissions related to the infringement which USI MidAtlantic, Inc. paid to its producers, including Thomas Haughey." *Id.* at ¶ 68. The jury "must subtract all of [USI MidAtlantic's] deductible costs from its gross revenue." *Id.* at ¶ 69. In contrast, because Haughey did not claim any deductible costs, or present any evidence of them at trial, the Court instructed the jury that for him "there are no deductible costs and thus there is no subtraction calculation to be made to eliminate" them. *Id.* at ¶ 70. Defendants had agreed to this instruction in the charge conference, and, of course, did not object to it.

---

[6]     In some places, this cited transcript erroneously identifies Mr. Zemaitis, counsel for defendants, as Mr. Wolfsohn, counsel for The Graham Company. As the transcript indicates, defense counsel's only objections to the Court's jury charge were to the instruction on spoliation of evidence, and to the instruction that defendants bore the burden of proof of their publication defense to copyright infringement liability. No objection to any of the Section 504(b) instructions was made.

[7]     Section 504(b) refers to this offset as "deductible expenses." The Court's jury instructions use the phrase "deductible costs." From here on, this brief will follow the Court's terminology.

Finally, the Court instructed the jury about Section 504(b)'s third step, the "apportionment" offset. Here, the Court explained that "[i]n addition to deducting USI MidAtlantic, Inc's costs, you may also deduct from both defendants' commissions related to the infringing proposals all amounts that are attributable to factors other than defendants' infringement." *Id.* at ¶ 71. The Court noted that the defendants bore the burden of proving these deductions, and reiterated to the jury: "It is for you to decide to what extent the defendants' commissions were attributable to copyright infringement, and whether the plaintiff is entitled to all of the defendants' commissions, none of the defendants' commissions, or something in between." *Id.* at ¶ 72.

**B.      The Graham Company's Damages Evidence at the First Trial**

The parties' damages presentations at trial followed the framework set out in Section 504(b), and in the Court's jury instructions. Consistent with Section 504(b), The Graham Company offered evidence (all of which was admitted) of each defendant's gross revenues, using USI's own revenue documentation and calculations based on that documentation presented by Dr. Richard Gering. That evidence covered the entire 14-year period of infringement addressed at the first trial, from July 1992 through June 2005. Dr. Gering testified that during the 1992-2005 period, USI MidAtlantic earned $31,830,914 in gross revenue, on 857 infringing proposals. Ex. C, Trial Tr. Day III, at 95:24-97:21, 104:6-106:3; Ex. D, PX 88A. From that $31.8 million figure, Dr. Gering also broke out the gross revenues linked to customer proposals that Thomas Haughey sent, which accounted for $12,252,782 of the overall $31.8 million amount. Ex. C, Trial Tr. Day III (Gering) at 104:6-25; Ex. D, PX 88A.

**C.      The Defendants' Damages Evidence at the First Trial**

The defendants opposed The Graham Company's damages case by offering evidence in support of both Section 504(b) offsets: "deductible costs" and "apportionment." Notably, in virtually every instance (the two exceptions are discussed below in footnote 10), the defendants'

evidence and arguments applied generically to all 857 proposals at issue in the case, including those proposals falling within the post-February 2002 period.

For "deductible costs," the defendants presented only limited evidence. As noted above, the defendants claimed only one category of deductible cost (producer commissions) for only one defendant (USI MidAtlantic). Through cross-examination of Dr. Gering, defense counsel established the amount of this deduction, "approximately twenty-five percent" of USI MidAtlantic's gross revenues. Ex. C, Trial Tr. Day III, at 138:18-140:16. Defendants did not present any evidence of additional deductible costs for USI MidAtlantic, nor did they present any deductible costs for Haughey.

Defendants spent more time on the "apportionment" offset, but again – with virtually no exception – defendants focused on broad, generic arguments universally applicable to each and every proposal, including the post-February 2002 ones. Defendants relied on two witnesses – defendant Thomas Haughey and fellow USI MidAtlantic producer Don Roberts – and sought to make three broad points.[8]

First, the defendants tried to establish that other factors caused customers to buy their insurance through defendants, factors ostensibly much more important than the language that appeared in the defendants' written proposals. To this end, defense counsel elicited testimony from Mr. Haughey that "cost is probably a major factor for most small business owners." Ex. C,

---

[8] The exception occurred when Mr. Roberts was asked to identify customers he had brought over to USI MidAtlantic from one of his two previous employers, Warren Welsh & Thompson or Aon. According to Mr. Roberts, the proposal formats he used while at Warren Welsh & Thompson and Aon had not, to his knowledge, contained any Graham Company language. Ex. E, Trial Tr. Day IV, at 109:8-12.

Mr. Roberts only identified 14 such customers (out of a total of 315 customers who had received 857 infringing proposals, see Ex. D, PX 88A): (1) Action Aids, Inc.; (2) Arcadia University (Beaver College); (3) B&G Manufacturing Co., Inc.; (4) Bancroft Neurohealth, Inc.; (5) Blue Seas Ventures, Inc.; (6) Cibran Management, Inc.; (7) Eastern National; (8) GECH, GEKP, GETN; (9) GE Management Group; (10) Great Expectations of Treasure Coast; (11) Roselon Industries, Inc.; (12) Silogram Enterprises, Inc.; (13) Strategic Link Consulting; and (14) Tredyffrin Township. Ex. E, Trial Tr. Day IV (Roberts), at 107:19-108:4, 109:13-111:4; Ex. F, DX 220.

Trial Tr. Day III, at 197:11-199:7.  Likewise, Mr. Roberts testified that "[a] lot of clients want to start with the premium page" of the written proposal because "[t]hey want to see what the cost of the coverage is going to be."  Ex. E, Trial Tr. Day IV, at 126:24-127:10.  Defendants presented this argument generically, that is, as applicable to all insurance proposals received by all of defendants' customers for the entire 1992-2005 time period.

Second, defense counsel tried to paint a picture of the USI MidAtlantic sales process that de-emphasized the role of the written proposal, relegating it to the end of a long process after the customer has, presumably, already made his or her buying decision.  To this end, defense counsel elicited testimony from Mr. Haughey that the "proposal meeting" (in which the producer and customer meet to discuss the insurance program embodied in the written proposal) is "generally last in the process" (Ex. C, Trial Tr. Day III, at 185:21-187:6); and that at that proposal meeting, Haughey typically presents the program orally first, at which point "the customer generally smiles, and says that's fantastic let's go ahead," all before Haughey has "even taken the books [*i.e.*, the written proposal] out of the bag" (*id.* at 193:23-195:15).  Haughey claimed that "very, very, very few customers will sit there and go through the actual language" of the proposal.  *Id.* at 195:11-15.

Defense counsel elicited similar testimony from Don Roberts.  Mr. Roberts testified that "[h]opefully . . . the entire proposal process can accomplish" the goal of influencing a customer to purchase a USI MidAtlantic insurance program.  Ex. E, Trial Tr. Day IV, at 128:20-129:5.  Mr. Roberts also discussed the sales process he employs, from "acquir[ing] as much information about the client as I can," to the "initial meeting" where "exposures" and "alternative ways that those risks can be dealt with" are explored, to "go[ing] into the market place" for insurance to see what kind of coverage can be obtained for the client.  Ex. E, Trial Tr. Day IV, at 121:21-

125:3. Again, these assertions were presented as being universally and generally applicable to every one of the defendants' proposals regardless of the time frame, customer, insurance situation, or any other particularity.

The defendants' third and final tack – in effect, the culmination of the other two points – was an attempt to have Mr. Haughey and Mr. Roberts directly opine on whether language in the written proposals had any effect on customers' buying decisions. Mr. Haughey claimed that there was no effect:

> I don't think the language that we use has any impact on the client's buying decision. If we tell him he needs to buy insurance for his boat, if he has a boat, then he'll say fine, let's talk about the boat insurance. I don't have to give him a paragraph description of how boat insurance works.

Ex. C, Trial Tr. Day III, at 201:5-25; *see also id.* at 196:10-197:10 ("I don't think the language has really any impact in the significance or the buying decision from a customer. . . ."). Despite the defendants' attempt to have Mr. Roberts testify similarly, he was not as willing as Mr. Haughey to speculate that his customers were not influenced by the language of proposals they received.[9] But again, the point that defendants were seeking to establish was a universal and generic one.

## D. The Graham Company's Closing Argument on Damages

In its closing, The Graham Company explained the proposed damages calculation it was asking the jury to make. Plaintiff relied on USI's revenue documents and Dr. Gering's calculations, as well as the summary exhibits (in particular PX 88A), but used round numbers for ease of comprehension. For USI MidAtlantic, The Graham Company noted that the evidence

---

[9]     In response to the question, "[I]n your opinion, does the language used in the proposal influence that client's decision whether or not to purchase the program," Mr. Roberts said that it did, "to the extent that it describes the coverage that is being purchased or being offered and then purchased." Ex. E, Trial Tr. Day IV, at 128:14-19. This testimony would support a higher percentage of apportionment to infringing language, and a lower Section 504(b) offset for apportionment to "other factors."

showed that USI MidAtlantic's "gross revenues" over the 1992-2005 infringement period were "thirty-one million dollars." Ex. A, Trial Tr. Day V, at 42:7- 43:6.

Plaintiff then turned to "deductible costs." The evidence showed that USI MidAtlantic's deductible costs were "twenty five percent" of the approximately $31 million gross revenue figure – *i.e.,* about "7.25 million dollars" – and The Graham Company told the jury to reduce the final damages number against USI MidAtlantic by that amount. After that $7.25 million offset, The Graham Company noted, USI MidAtlantic's profit figure – before being apportioned between infringement and other factors – was about $23,750,000. Ex. A, Trial Tr. Day V, at 42:7-43:6.

With regard to apportionment, The Graham Company told the jury that this was an issue for them to decide, and that "it's defendant's burden . . . to show to what extent . . . that number was caused by some factor other than the written proposals that infringe." *Id.* at 43:7-11.

The Graham Company then turned to the Section 504(b) profit calculation for Mr. Haughey. Dr. Gering had testified (as shown in PX 88A) that the revenue from infringing proposals sent by Haughey during the 1992-2005 period added up to $12,257,782 – or about $12 million – in commissions to USI MidAtlantic. The evidence also showed that Haughey had received 25% of those commissions. In other words, Haughey's individual revenues from the infringing proposals were 25% of the commissions he obtained for USI MidAtlantic – or, as The Graham Company told the jury, about $3 million (precisely, $3,063,195). Ex. A, Trial Tr. Day V, at 43:12-44:2 ("So, twenty-five percent is one quarter, of twelve-million, is three-million dollars. . . . That's the money that went to Mr. Haughey on the accounts with the infringing proposals.").

With respect to Section 504(b)'s two offsets, Mr. Haughey did not claim an offset for deductible costs, and so the jury was not asked to make any deduction for those expenses. As for

apportionment, plaintiff's counsel stated to the jury that "you will then have to decide what percentage would fairly be attributable to something other than his use of the books." *Id.* at 44:3-5.

### E.    The Defendants' Closing Argument on Damages

The defendants in closing, as they did through their evidence, focused almost exclusively on broad arguments (again, see footnote 10 for the exceptions) universally applicable to all of defendants' infringing proposals regardless of time period, customer, producer, or any other particularity.  With regard to "deductible costs," defense counsel agreed that the calculation The Graham Company presented – a 25% reduction of only USI MidAtlantic's gross revenues – was proper.  Ex. A, Trial Tr. Day V, at 78:21-79:1 ("as Mr. Wolfsohn told you, you have [to] deduct the producer commissions before you do anything else, and that's at least twenty-five percent").

Turning to apportionment, defendants' principal argument was again primarily a universal and generic one.  Defendants mainly argued, and greatly emphasized, that *none* of the defendants' profits was attributable to infringement – that is, defendants claimed that *0%* of their profits should be apportioned to their infringement, and that the Section 504(b) offset for "other factors" should be 100%.  This was because, according to defendants, their profits were the result of "many, many different factors" besides the use of infringing language, so that "no award to Graham was merited":

> Now, at the end of the day, the commissions earned by USI and Tom Haughey are attributable to many, many different factors.  But, the use of a small amount of language from the Standard Proposal, subject to copyright protection, is not one of them.
> For this reason, no award to Graham was merited.  Even if you conclude that infringement has occurred.  (Ex. A, Trial Tr. Day V, at 90:11-24).

Defendants' fall-back position on apportionment was also a universal and generic one. Defense counsel argued that if the jury were to apportion some of the defendants' profits to the proposal language infringing The Graham Company's copyrights, that apportionment should be

no more "than one or two percent of the total commissions" – again, a universal contention

applicable across-the-board to all of the defendants' proposals before the jury, including the post-

February 2002 ones:

> But, if you do decide that the use of Graham's language was a
> factor, was a factor in some client's decision to use USI – now Mr.
> Wolfsohn said you'll have to determine the percentage, I submit to you
> that that amount can not be more than one or two percent of the total
> commissions earned by USI or Tom Haughey.  (*Id.* at 90:18-24).

Echoing their evidentiary presentation, defendants also argued that there were "multiple

factors having nothing to do with the language used in the proposal" that drove insurance

customers' buying decisions, such as "the effort and experience of the producer," "the quality

and the price of the insurance program he was able to deliver," and the "face to face personal

attention that wins the client's confidence."  *Id.* at 86:14-17, 88:23-89:17.  All of these generic

arguments applied to every one of the defendants' infringing proposals.

Defendants also returned to the notion that a written proposal has limited importance

because it comes only at the end of a "many month, many staged process" that producers go

through, from "learn[ing] about the client's business," to an "analysis of the [client's] existing

insurance," to a "discussion of the client's goals," by which point "the client is pretty much

committed to the program."  *Id.* at 86:18-88:4.  For this point, the closing relied heavily on a

proposed analogy between a written insurance proposal and a "brochure" handed out by a car

salesman after the customer has already "go[ne] out in the lot," "look[ed] at the cars," "test

drive[n] one or two," "picked the one that seems right," and "discuss[ed] price."  *Id.* at 76:16-

77:23.  Again, defendants presented a universal, across-the-board theme encompassing all

infringing proposals.[10]

---

[10]    There were only two exceptions to these universal arguments, in which defendants singled out a
particular group of proposals for special treatment.  First, defense counsel mentioned that infringer profits

F.     The Jury's Verdict

After the close of evidence and argument, and after receiving the Court's instructions, the jury was asked to answer four special interrogatories.  The last two interrogatories related to damages and were posed in the alternative, depending on the jury's decision on the defendants' statute of limitations defense.  The jury deliberated for about three hours over the course of an afternoon and the following morning.  Ex. A, Trial Tr. Day V, at 124:12-20 (deliberations from 2:47 to 4:24 p.m.); Ex. G, Trial Tr. Day VI, at 3:1-2 (verdict returned at 10:00 a.m.).  The jury's verdict was in favor of The Graham Company on liability and on the statute of limitations defense.  *Id.* at 3:16-4:2.

The fourth interrogatory asked the jury to find the amount of damages that would compensate The Graham Company for the defendants' infringement.  Specifically, question four asked: "What is the total amount of each defendants' profits attribute to infringement, if any, that each defendant earned?"  *Id.* at 4:4-7.  Against USI MidAtlantic, the jury awarded profits of $16,561,230.  Against Thomas Haughey, it awarded profits of $2,297,397.  The total award against both defendants was $18,858,627.

The award of $16,561,230 against USI MidAtlantic was 69.4% of the $23,873,185 in USI MidAtlantic profits that remained after its deductible costs had been taken out.  In other words, in performing the third, "apportionment" step of Section 504(b)'s three-step formula, the jury

---

should not be awarded on proposals sent to clients of Don Roberts, since Roberts had testified that these customers were brought over from his former employers.  Ex. A, Trial Tr. Day V (defense closing), at 79:7-12.  As noted, that encompasses only 14 of the 857 total proposals.  *See supra* note 8.

Defense counsel also specifically identified a handful of proposals that had "only a small amount of language copied," (Ex. A, Trial Tr. Day V, at 80:17-22), the implication being that this small-scale copying cannot have influenced a customer's buying decision.  That assertion encompassed only six proposals identified by defendants in closing:  (1) Able Energy, Inc.; (2) B&G Manufacturing Co., Inc.; (3) County of Lehigh; (4) MGK Industries, Inc.; (5) Penn National Gaming; (6) Bancroft Neurohealth, Inc.  *Id.* at 80:20-84:15; *see also* Ex. F, DX 220.

15

had reduced the profit figure for USI MidAtlantic's infringement by 30.6% – or about $7.3 million – to account for "other factors" responsible for the profits.

As for Thomas Haughey, the jury awarded $2,297,397 in profits against him, which was 75% of the $3,063,195 net profit figure presented as to his infringement. In apportioning his profits to infringement versus "other factors," the jury had reduced his profit figure by 25% – or about $765,000 – to account for "other factors."

In total, the jury awarded 70% of the defendants' combined profits – $18,858,627 out of a combined total of $26,936,380 in profits – apportioning 30% – or a little over $8 million – of those profits to factors other than defendants' use of infringing language.

### G.        Post-trial Motions and Briefing

Following the verdict, defendants filed motions under Rules 50 and 59, asserting various grounds for the grant of judgment as a matter of law or of a new trial. D.I. 137 (motion), D.I. 144 (memorandum in support of motion). Only two of those grounds are relevant to this motion. First, defendants argued that the Court should grant a new trial on their statute of limitations defense because the jury's verdict in favor of The Graham Company on that issue was against the manifest weight of the evidence. The Court did grant a new trial on that issue. D.I. 161, Nov. 21, 2006 Mem. Op., at 34.

Second, and more importantly for present purposes, the defendants also sought a new trial based on an argument that the first jury's apportionment of profits – *i.e.*, its analysis under the third step of Section 504(b)'s three-step formula – was not supported by the manifest weight of the evidence. D.I. 144 at 23-30.[11] Notably, defendants' post-trial briefing on the issue repeated defendants' trial themes – defendants focused on generic, universal arguments applicable across-the-board to all of defendants' proposals. Defendants argued, for instance, that

---

[11]        For ease of reference, the defendants' new trial brief is attached as Exhibit H.

as a general principle, their proposals' infringing language was not important to customers' purchasing decisions. *See, e.g.*, *id.* at 26-27 (listing other factors the defendants contend drive customer decision-making, such as "the producers personal relationship with the client, the client's understanding of the services that USI will provide, the producer's understanding of the client's business, and the producer's efforts to reduce client risk").

Importantly, the Court expressly declined to validate the defendants' apportionment argument. D.I. 161, Nov. 21, 2006 Mem. Op. at 34-35. The Court expressly stated that its new trial ruling was premised on the statute of limitations ground – not apportionment – and so it would "not reach these additional issues." *Id.* The Court did order a re-trial "as to damages" but only insofar as damages were "inextricably bound up with the question of the application of the statute of limitations." *Id.* at 34.

Subsequently, the defendants made another motion based on the statute of limitations, this time seeking an entry of summary judgment in their favor. The Court granted the defendants' motion, holding that any copyright infringements occurring prior to February 9, 2002 were time-barred and hence could not support a damages recovery. D.I. 188, Mar. 29, 2007 Mem. Op., at 28. Recognizing that each act of infringement is a separate violation of the Copyright Act (and thus carries a separate limitations period), the Court noted that The Graham Company "of course, will still be able to recover defendants' profits arising from acts of infringement occurring on or after" February 9, 2002. *Id.* The Court stated that "[t]he damages Graham is entitled to recover after February 9, 2002 cannot be resolved on the record before us and must be decided at a new trial." *Id.*

The ultimate effect of the Court's two statute of limitations rulings was to re-open the question of damages at a second trial, for the post-February 2002 period of copyright

infringement. The question this begs, and that this brief addresses, is the scope of the damages-related factual issues to be actually decided by the second jury, particularly in light of important Reexamination Clause constraints.

To the extent that a second jury, at a second trial, will be asked to take the first step in Section 504(b)'s three-step calculation – determining the pool of "gross revenues" for the post-February 2002 infringement period from which infringing profits can be awarded – Seventh Amendment constraints are not implicated. The second jury is not being asked to find a fact that the first jury had already found. However, the Reexamination Clause would preclude the second jury from deciding step 2 ("deductible costs") and step 3 ("apportionment") of the Section 504(b) calculus. As explained in this brief, the latter scenario would invite a second jury to re-visit and re-decide factual issues already determined by the first jury at the first trial, which would run directly afoul of the Reexamination Clause.

### H. Summary of Section 504(b) Calculations

To aid in subsequent discussion, the following chart summarizes the evidence and jury calculations as to Section 504(b)'s profits at the first trial:

| | USI MidAtlantic, Inc. | Thomas Haughey | Combined |
|---|---|---|---|
| "Gross Revenue" | 31,830,914 | 3,063,195 | 34,894,109 |
| "Deductible expenses" | 7,957,729 | N/A | 7,957,729 |
| "Profits" | 23,873,185 | 3,063,195 | 26,936,380 |
| Jury's Damages Verdict Amount | 16,561,230 | 2,297,397 | 18,858,627 |
| Jury's Damages Verdict Amount as Percentage of "Profits" ("Apportionment") | 69.4% | 75.0% | 70.0% |
| Jury's Apportionment Reduction (in $) | 7,311,955 | 765,798 | 8,077,753 |
| Jury's Apportionment Reduction (as %) | 30.6% | 25.0% | 30.0% |

Notably, defendants themselves offered a summary of how the first jury went about calculating and deciding Section 504(b) profits. Defendants presented that summary in their new trial briefing, in support of their contention that the first jury's Section 504(b) apportionment lacked sufficient evidentiary support. D.I. 144 at 25-29 & n.10. The defendants' summary is virtually identical to the summary presented above:

> Dr. Gering testified that USI's total commission revenue totaled $31,830,914, of which 25% was paid by USI to its producers, leaving a net commission of $23,873,185. Applying the 25% figure to the total commissions generated for Mr. Haughey's clients ($12,252,782), yields commissions to Mr. Haughey himself of $3,063,195 (from which no costs are deducted). Thus, the total net commissions for both defendants is $26,936,380. The total jury award is $18,858,627, which is 70% of the total net commissions.

*Id.* at 26 n.10 (citations omitted). According to defendants, the first jury decided apportionment issues universally for all proposals, and applied an across-the-board apportionment offset of 70%, *i.e.*, it reduced the total amount of profits awarded against both defendants' by 30% to account for evidence of "other factors" responsible for defendants' profits: "It was unreasonable for the jury to conclude that 70% of defendants' net commissions were attributable to the language in the written proposals that came from Graham's Works." D.I. 144 at 29; *see also id.* at 25-26.

## ARGUMENT

**I.     The First Jury Has Already Decided Section 504(b)'s "Deductible Costs" and "Apportionment" Offsets for All Proposals, Including the Ones in the Post-February 2002 Period.**

The key to resolving the significant Seventh Amendment and procedural issues in this case lies in answering a central, threshold question: What factual issues, under the Section 504(b) framework, did the first jury already decide in arriving at its final verdict figure of $16,561,230 in infringer profits against USI MidAtlantic and $2,297,397 in infringer profits against Thomas Haughey? In general, a jury's verdict is reviewed in light of "the entire case," including

"evidence, argument, [and] jury instructions."  *Royal Cup, Inc. v. Jenkins Coffee Service, Inc.*, 898 F.2d 1514, 1521 (11th Cir. 1990).

As an initial matter, it is clear that the first jury necessarily rejected several of the defendants' more aggressive arguments concerning Section 504(b) offsets.  Defendants argued to the first jury that there should be *no* apportionment of profits to *any* of the infringing  proposals in the entire 1992-2005 infringement period, including the proposals in the post-February 2002 period that will be subject of the damages re-trial.  In other words, defendants argued across-the-board, for each and every one of their infringing proposals (including the post-February 2002 ones), that *0%* of the profits generated from customers receiving those proposals was attributable to the infringing language.  This was because, according to defendants, other, universally applicable factors like sales skills and premium costs were the actual drivers of sales. Ex. A, Trial Tr. Day V (defense closing) at 90:1-24.  The first jury necessarily rejected these generic, universal contentions when it awarded The Graham Company a substantial percentage of each defendant's profits.

The first jury also necessarily rejected the defendants' fall-back position – another contention universally applicable to all the infringing proposals – that any apportionment greater "than one or two percent of the [defendants'] total commissions" was too high.  Ex. A, Trial Tr. Day V (defense closing) at 90:1-24.  In effect, defendants contended that any apportionment of profits between 2% and 100% to the defendants' infringement was inappropriate.  The first jury explicitly rejected that contention when it awarded The Graham Company around 70% of USI MidAtlantic's gross revenues and 75% of Haughey's gross revenues as Section 504(b) profits.

It is also fair and logical to conclude that the first jury arrived at its infringer profits award by following Section 504(b)'s three-step formula, as that formula was explained to the

first jury in the Court's instructions. After all, a jury is presumed to follow the instructions it is given, *see, e.g.*, *United States v. Urban*, 404 F.3d 754, 776 (3d Cir. 2005), and here, the Court carefully explained – in instructions to which defendants did not object – the three steps necessary under Section 504(b) to arrive at the bottom-line infringer profit figure. Ex. B, Jury Instructions, at ¶¶ 66-69.

Thus, it is fair and reasonable to conclude that the first jury began its analysis by performing the first step of Section 504(b)'s three-step formula – it determined "gross revenues" for each of the two defendants over the 1992-2005 infringement period. The first jury relied on the principal "gross revenue" evidence presented at trial – USI's revenue information and the calculations performed by Dr. Richard Gering, as reflected as well in certain summary exhibits (Ex. C, Trial Tr. Day III, at 95:24-97:21, 104:6-25; Ex. D, PX 88A) – and on plaintiff counsel's closing argument explaining plaintiff's recommended "gross revenue" calculations (Ex. A, Trial Tr. Day V, at 42:7-43:6). This step would have yielded a "gross revenue" figure of $31,830,914 for USI MidAtlantic, and $3,063,195 for Mr. Haughey.

It is also fair and logical to conclude that the first jury next turned to Section 504(b)'s second step – it determined the amount to offset against defendants' gross revenues to account for "deductible costs." Here, it is clear from the trial record – particularly the defendants' closing argument, and the Court's jury instructions – that the amount of this offset was undisputed. The parties agreed that "deductible costs" applied to USI MidAtlantic's gross revenues only, not to Mr. Haughey's, and that these expenses amounted to "twenty-five percent" of USI MidAtlantic's revenues. Ex. A, Trial Tr. Day V (plaintiff's closing), at 42:7-43:6; *id.* at 78:21-79:1 (defense closing). Thus, at this second stage of the Section 504(b) calculus, USI MidAtlantic's gross revenue figure was reduced to a profit figure of $23,873,185, and Mr.

Haughey's gross revenue figure of $3,063,195 became his profit figure (because of the lack of any claimed or proven expense deduction as to him).

Lastly, with regard to the third and final Section 504(b) step – "apportionment" – the most logical and reasonable conclusion is that the first jury apportioned the defendants' profits to defendants' infringing proposals in a universal fashion. In other words, the fair and reasonable conclusion is that the first jury applied an offset for "apportionment" across-the-broad to all of the infringing proposals before it, including those proposals in the post-February 2002 period that will be the subject of the damages re-trial. A number of items support this conclusion.

First, it is clear from the trial record that defendants' opposition to The Graham Company's damages case focused almost exclusively on generic, universal arguments that covered each and every infringing proposal disseminated by defendants, including the post-February 2002 ones. For example, defendants emphasized their evidence that "many, many different factors" contributed to profits – factors like premium costs and salespersons' interpersonal skills. And defendants stressed that at USI MidAtlantic, the written proposal supposedly plays a limited role in the sales process, because it comes at the "end of the process." Ex. C, Trial Tr. Day III (Haughey), at 185:21-187:6, 197:11-199:7; Ex. A, Trial Tr. Day V (defense closing), at 86:14-17, 88:18-89:17, 90:11-24.

Likewise, defendants had Thomas Haughey voice a universal opinion about what in his view mattered to USI MidAtlantic's profit generation from customers. Mr. Haughey testified point blank: "I don't think the language that we use has any impact on the client's buying decision." Ex. C, Trial Tr. Day III, at 201:5-25; *see also id.* at 197:3-4 ("The way I describe it has no impact or whether or not they buy it."). Mr. Haughey's argument was a generic one about all of defendants' proposals; he did not speak to any particular category or group of proposals.

Indeed, defense counsel expressly invited to the jury to make their Section 504(b) apportionment decisions across-the-board, in a universal fashion. In closing, defense counsel told the jury: "if you do decide that the use of Graham's language was a factor . . . you'll have to determine the percentage, I submit to you that that amount can not be more than one or two percent *of the total commissions earned* by USI or Tom Haughey." Ex. A, Trial Tr. Day V, at 90:11-24 (emphasis added). Defense counsel gave a universal apportionment percentage (no "more than one or two percent") and explicitly asked the jury to apply that percentage to "total commissions earned" – that is, revenues from *all infringing proposals* – not some subset of proposals.[12]

Given the dominant argument and evidence presented to the jury, it is only fair and reasonable to conclude that the jury apportioned in a universal, across-the-board fashion. Indeed, defendants' own briefing provides the best support for this conclusion. In seeking a new trial on Section 504(b) apportionment, defendants explained the first jury's infringing profits calculation in a manner virtually identical to the one presented above:

> Dr. Gering testified that USI's total commission revenue totaled $31,830,914, of which 25% was paid by USI to its producers, leaving a net commission of $23,873,185. Applying the 25% figure to the total commissions generated for Mr. Haughey's clients ($12,252,782), yields commissions to Mr. Haughey himself of $3,063,195 (from which no costs are deducted). Thus, the total net commissions for both defendants is $26,936,380. The total jury award is $18,858,627, which is 70% of the total net commissions.

D.I. 144 at 26 n.10 (citations omitted). Defendants also understood and directly asserted in their briefing that the first jury had arrived at an apportionment percentage of 70% and applied it to all of the defendants' infringing proposals. *See id.* at 25-26, 29 ("It was unreasonable for the jury to

---

[12]     As noted in the fact section, defendants did mention that two specific categories of infringing proposals should be excluded from any damages award – those sent to pre-USI MidAtlantic customers of producer Don Roberts, and those mentioned in defendants' closing as having only a small amount of copied. *See infra* note 10. But defendants did not place much emphasis on this point, and indeed, their dominant contentions were the generic, universally applicable ones discussed in detail above.

conclude that 70% of defendants' net commissions were attributable to the language in the written proposals that came from Graham's Works.").

Defendants, in their new trial briefing, concluded that the first jury's apportionment was done across-the-board – that is, that the first jury had analyzed the entire group of infringing proposals before it (including the post-February 2002 ones) as a whole.  That, of course, means that the first jury had already decided what apportionment percentage should be applied to the post-February 2002 proposals that will be the subject of the upcoming damages re-trial.  Defendants' conclusion about what the first jury did continues to be a fair, logical, and reasonable one.

The fact that one might be able to speculate about alternative calculations the first jury could have performed, and that one can never be absolutely certain about what happened in the jury room, is ultimately beside the point.  The question is not what the first jury might have possibly done in applying Section 504(b) to calculate damages; it is what one can logically and reasonably conclude about what the first jury did, in light of the Court's jury instructions, and the evidence and argument presented to the jury before they retired to deliberate.  The most pertinent case law here comes from the highly analogous context in which a court is reviewing a jury's possibly inconsistent answers to interrogatories to see whether the answers can be reconciled.[13]

Courts unanimously have held that the test to apply to conflicting jury responses is to determine "whether the jury's answers can 'be said to represent a logical and probable decision on the relevant issues as submitted.'"  *Willard v. The John Hayward*, 577 F.2d 1009, 1010 (5th Cir.

---

[13]     This context is analogous because, like the Reexamination Clause concerns at issue in this case, courts' obligations with regard to review of inconsistent jury answers arise directly from the Seventh Amendment.  In the Reexamination Clause context, courts have a Seventh Amendment obligation to ensure that "a given issue" is not "tried by different, successive juries." *Blyden v. Mancusi*, 186 F.3d 252, 268-69 (2d Cir. 1999).  Likewise, in the context of inconsistent interrogatory answers, courts have stressed that they must "attempt to harmonize the jury's answers, if that is possible," because of Seventh Amendment considerations. *Anastasio v. Schering Corp.*, 838 F.2d 701, 710 (3d Cir. 1988).

1978) (quoting *Griffin v. Matherne*, 471 F.2d 911, 915 (5th Cir. 1973)); *Gallimore v. Missouri Pacific R.R. Co.*, 635 F.2d 1165, 1172 (5th Cir. 1981) (following *Willard* and *Griffin* "logical and probable" test); *Royal Cup*, 898 F.2d at 1516 (11th Cir. 1990) (following *Griffin* "logical and probable" test).[14]  At least two courts in the Third Circuit has explicitly followed this "logical and probable decision" standard as well.  *See U.S. v. 0.78 Acres of Land*, 81 F.R.D. 618, 621 (E.D. Pa. 1979) (Troutman, J.), *aff'd without op.*, 609 F.2d 504 (3d Cir. 1979); *Strauss v. Springer*, 817 F. Supp. 1211, 1214 (E.D. Pa. 1992).

Looked at this from the "logical and probable" perspective, the most reasonable and logical view of the first jury's Section 504(b) calculation is that the first jury started with the "gross revenue" figures presented by The Graham Company; applied the 25% "deductible costs" offset agreed to by the parties to USI MidAtlantic's gross revenue figure; considered all of the universally-applicable "apportionment" arguments relied on by the defendants; and then applied an across-the-board offset to the defendants' profits to account for "other factors" responsible for defendants' profits.  In other words, it is entirely logical and reasonable to conclude that the first jury calculated Section 504(b) infringer profits in the very same way the defendants have previously represented that that calculation was performed.  *See* D.I. 144 at 25-26 & n.10.

## II.    A Second Jury Deciding Certain Section 504(b) Damages Issues Should Be Constrained By the First Jury's Determinations

Because a first jury, in a first damages trial, has already decided several important Section 504(b) factual issues, the law imposes constraints on what a second jury can be asked to

---

[14]    *See also Riley v. Kmart Corp.*, 864 F.2d 1049, 1052-53 & n.2 (3d Cir. 1988) (citing to the Fifth Circuit, and its decisions in *Willard* and *Gallimore*, as authority in the area of inconsistent jury answers to interrogatories).  Other courts that follow the "logical and probable decision" test include: *Allen Organ Co. v. Kimball Int'l, Inc.*, 839 F.2d 1556, 1563-64 (Fed. Cir. 1988) (following *Willard* and *Griffin* "logical and probable" test); *Bingham v. Zolt*, 66 F.3d 553, 563 (2d Cir. 1995) (citing *Royal Cup* for the proposition that appellate court's task is "to ascertain whether the trial court's reconciliation of the apparently inconsistent verdict is a reasonable reading of the record").

decide in a damages re-trial. Those constraints arise principally from the Seventh Amendment's Reexamination Clause.

### A. The Reexamination Clause Precludes a Second Jury From Re-Trying Issues Already Decided by a First One

The Reexamination Clause provides that "no fact tried by a jury shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law." U.S. Constit. Amend. VII. Courts have authority under Rule 59 to grant a new trial on an issue when there has been an error in the proceeding, but if a court finds no error, or if it does not provide an adequate basis for holding a new trial on an issue, the Reexamination Clause's constraints remain in full force and effect. *See e.g.*, *In re Rhone-Poulenc Rorer, Inc.*, 51 F.3d 1293, 1303 (7th Cir. 1995); *Crane v. Consolidated Rail Corp.*, 731 F.2d 1042, 1051 (2d Cir. 1984) (holding that an order extending the scope of a new trial on damages ran afoul of the Seventh Amendment when the order lacked an "articulation of a sufficient basis for such action").[15] Here, the Court granted a new trial on damages only insofar as it pertained to statute of limitations issues, and explicitly _declined_ the defendants' request to invalidate the first jury's damages determination because of asserted errors in the jury's Section 504(b) calculation. D.I. 161, Nov. 21, 2006 Mem. Op., at 34-35. The Reexamination Clause thus continues to protect the first jury's 504(b) calculations.

"The Reexamination Clause generally forbids the retrial of issues that have been determined by a valid jury verdict." Patrick Woolley, Mass Tort Litigation and the Seventh Amendment Reexamination Clause, 83 Iowa L. Rev. 499, 532 (1998). The Third Circuit has explained that this constitutional provision "operate[s] as a guarantee of the integrity of the

---

[15] Courts have read the Reexamination Clause's last phrase – "than according to the rules of the common law" – as preserving a court's power to grant new trials, embodied in Rule 59. *See, e.g.*, *Gasperini v. Ctr. for Humanities*, 518 U.S. 415, 432-33 (1996); *Skinner v. Total Petroleum, Inc.*, 859 F.2d 1439, 1442-43 (10th Cir. 1988) (per curiam). But courts have also made clear that the basis for that new trial grant must be adequately specified. *See Crane*, 731 F.2d at 1051.

judicial process generally and as a check on the powers of the trial judge specifically." *Davis v. Omitowoju*, 883 F.2d 1155, (3d Cir. 1989) (Garth, J.); *cf. Gasperini v. Ctr. for Humanities*, 518 U.S. 415, 432-33 (1996) (recognizing that the Reexamination Clause, and the Seventh Amendment generally, guide "the allocation of trial functions between judge and jury").

The most concise recent statement about the Reexamination Clause's operation comes from Judge Richard Posner of the Seventh Circuit, who explained that litigants have a right to preclude a second jury from re-examining, or re-deciding, issues already "determined by the first jury impaneled to hear them":

> The right to a jury trial in federal civil cases, conferred by the Seventh Amendment, is a right to have juriable issues determined by the first jury impaneled to hear them (provided there are no errors warranting a new trial), and not reexamined by another finder of fact . . . . In this limited sense, a jury verdict can have collateral estoppel effect.

*Rhone-Poulenc*, 51 F.3d at 1303; *see also Blyden v. Mancusi*, 186 F.3d 252, 268 (2d Cir. 1999) (reversing district court's decision as to the scope of a damages trial on Seventh Amendment grounds, and citing *Rhone-Poulenc* for the proposition that "a given issue may not be tried by different, successive juries").[16]

The Third Circuit, explaining the Reexamination Clause's history, described its operation in much the same way as Judge Posner did: "[O]nce facts had been found by a jury, the framers of the second clause of the Seventh Amendment provided for further protection . . . by decreeing that such jury factfinding must be final." *Davis*, 883 F.2d at 1164. The Third Circuit has also recently applied the Reexamination Clause to an antitrust case involving successive jury trials. *See In re*

---

[16]    Courts discussing this principle have referenced not just the Reexamination Clause specifically, but also the Seventh Amendment generally. *See, e.g.*, *Freeman v. Chicago Park Dist.*, 189 F.3d 613, 618 (7th Cir. 1999) ("The Seventh Amendment prohibits a second jury from being given the opportunity to render a verdict inconsistent with a prior jury's verdict."); *Greenhaw v. Lubbock Cty. Bev. Ass'n.*, 721 F.2d 1019, 1025 (5th Cir. 1983) ("That right to jury trial includes the right to have a single issue decided one time by a single jury.").

*Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144 (3d Cir. 1993) (Mansmann, J.). In fact, the Third Circuit in *Lower Lake Erie* reversed a district court order permitting damages causation issues decided by a first jury to be re-argued to and re-decided by a second jury.

The *Lower Lake Erie* case involved claims of anticompetitive activity in the Lake Erie market for transporting iron ore, including claims brought by three trucking companies – the Wills plaintiffs. *See id.* at 1151-52 & n.1. The district court bifurcated trial into a liability phase and a damages phase. In the liability phase, a first jury resolved, via answers to special interrogatories, the question of damages causation – it determined that defendants' anticompetitive conspiracy had "cause[d]" "injury" to the Wills plaintiffs' "business or property." *See id.* at 1155, 1182-83. In the subsequent damages trial, however, the trial court invited the second jury to reconsider damages causation, and it permitted defendants to offer evidence and argue that there were "potential causes for the plaintiff's damage other than the antitrust conspiracy." *Id.* at 1183.

The Third Circuit reversed the trial court, finding that the conduct of the second trial ran afoul of the Reexamination Clause "[b]ecause causation elements re-entered the damages phase of the trial." *See id.* at 1181-82, 1185; *see also id.* at 1183 ("the Seventh Amendment prohibition against reexamination of the issue of fact of damage was compromised soon after the damages jury was empaneled"). Because a second jury was being asked to re-examine and re-decide damages causation questions already determined by a first jury in a prior trial, the *Lower Lake Erie* court held that the Seventh Amendment was violated.

The *Lower Lake Erie* decision provides important guidance as to what factual issues may be permissibly tried in a second jury trial, given that a first jury has already made certain factual

determinations.  Indeed, the *Lower Lake Erie* decision involved damages causation questions akin to the Section 504(b) "apportionment" issues decided by the first jury in this case.

### B. The Second Jury on Re-Trial Should Be Asked to Decide Only the Amount of *Gross Revenues* for the Post-February 2002 Period

Because of the Reexamination Clause's restraints on the re-determination of factual issues already decided by a prior jury, the task of a second jury at the damages re-trial is a limited one.  This Court has already narrowed the temporal scope of the re-trial.  Because of the Court's grant of partial summary judgment on the defendants' statute of limitations defense, the only infringements at issue on re-trial are those occurring after February 8, 2002.  D.I. 188, Mar. 29, 2007 Mem. Op., at 28.  With respect to the first step of Section 504(b)'s three-step formula, the first jury made a determination of "gross revenues" for the entire 1992-2005 time frame, without breaking out the post-February 2002 period in particular.  The second jury should therefore be asked to determine the total amount of each defendants' *gross revenues* reasonably related to their infringements occurring after February 8, 2002.

But the second jury's task should not be any broader.  As explained, it is entirely fair, logical, and reasonable to conclude (and to mathematically calculate) that the first jury has already decided the remaining two steps of the Section 504(b) formula – "deductible costs" and "apportionment" – for *all* of the defendants' proposals, both those related to infringements taking place before February 9, 2002 *and* those related to infringements occurring *after* that date.  Accordingly, there is nothing for the second jury to decide as to these two offsets.  Indeed, if the second jury is asked to undertake that analysis, it would be re-deciding issues already resolved by the first jury – a scenario that the Reexamination Clause explicitly forbids.  *See, e.g.*, *Rhone-Poulenc*, 51 F.3d at 1303; *Blyden v. Mancusi*, 186 F.3d 252, 268 (2d Cir. 1999) ("a given issue may not be tried by different, successive juries"); *Freeman v. Chicago Park Dist.*, 189 F.3d 613,

618 (7th Cir. 1999) ("The Seventh Amendment prohibits a second jury from being given the opportunity to render a verdict inconsistent with a prior jury's verdict.")

C.     **Defendants Should Not Be Permitted to Bolster Their "Apportionment" Arguments and Evidence at the Damages Re-trial**

Defendants may argue that they should be permitted at the damages re-trial to present evidence about apportionment factors unique to the post-February 2002 group of proposals in particular. But at least two Reexamination Clause decisions have rejected this notion – *i.e.*, that a first jury's decision about a global set of claims still permits re-examination and re-argument directed to a smaller subset of those claims. In *Blyden v. Mancusi*, a civil rights class action case from the Second Circuit, the main liability issue was whether various acts of the defendant prison officials amounted to "reprisals" (and hence civil rights violations). 186 F.3d 252, 259 (2d Cir. 1999). During the first trial, on liability, a first jury determined that the defendants had "engaged in reprisals" against the entire class ("against the plaintiffs or any of them"). *Id.* at 260. The Second Circuit held that this determination sufficed, in light of the Seventh Amendment, to preclude the defendants from arguing in a second damages trial that an individual act of theirs did not constitute a "reprisal" or that an individual plaintiff member of the class was not the victim of a "reprisal"; the Seventh Amendment would be "clearly violated" if the "acts found to be 'reprisals' by the liability jury were different from the acts found to be 'reprisals' by the damages juries." *Id.* at 268-69.

Similarly, in *Greenhaw v. Lubbock Cty. Beverage Ass'n*, an antitrust class action from the Fifth Circuit, the issue was whether a first jury's determination that the plaintiff class had suffered injury as a result of anticompetitive conduct precluded the defendant from arguing during a second damages trial that a particular subset of plaintiffs were not harmed. The first jury found that each of the defendants had engaged in an antitrust conspiracy to fix retail alcohol

prices, and found that the plaintiff class as a whole suffered damages of $927,078. *See Greehaw*,
721 F.2d 1019, 1023-24 (5th Cir. 1983). The Fifth Circuit rejected the defendants' contention
that they should be permitted in a second individualized damages trial to show that one particular
subset of plaintiffs – those who bought alcohol by the case, and received discounts – was not
individually harmed: "the issue of injury to the entire class was developed sufficiently for the
[first] jury, and the jury findings on this record produced a calculus that prevented
redetermination in phase two." *Id.* at 1025-26.

In short, as is evident from the arguments, evidence, and jury instructions presented at the
first trial, the first jury has already decided certain key Section 504(b) factual issues – including
the percentage amount of apportionment for all infringing proposals, including those in the post-
February 2002 period. The Reexamination Clause precludes a second jury from re-visiting and
re-deciding those factual issues.

## III. Defendants Should Not Be Permitted to Bolster Their Case on "Deductible Costs"

The first jury not only made certain factual determinations as to "apportionment" – step 3
of Section 504(b)'s three-step formula – but also as to "deductible costs" – step 2. "Deductible
costs" were a non-controversial issue at the first trial. The Graham Company and the defendants
agreed (1) that "deductible costs" encompassed only one category of expense (producer
commissions); (2) that these costs applied as an offset to only one defendant (USI MidAtlantic);
and (3) that the amount of this deduction was 25% of USI MidAtlantic's gross revenues. Ex. A,
Trial Tr. Day V (plaintiff's closing), at 42:7-43:6; *id.* at 78:21-79:1 (defense closing); Ex. B, Jury
Instructions, at ¶¶ 68-69. It is only fair and reasonable to conclude that the first jury followed the
Court's instructions, and the invitation of the parties, and deducted this 25% from USI

MidAtlantic's gross revenues – both for those proposals in the pre-February 2002 period _and_ for those proposals in the post-February 2002 period that will be the subject of the damages re-trial.

There is no reason for defendants to now have the opportunity, on re-trial, to prove up new and different or additional expense categories. This constraint arises not only from the Reexamination Clause – since the first jury already applied this deduction to the post-February 2002 period – but also from basic procedural considerations of fairness. *See, e.g.*, 11 Charles Alan Wright et al., Federal Practice & Procedure 2d § 2803, at 50 (in the new trial context, "[d]ecisions respecting the admission of additional witnesses and proof should be guided by considerations of fairness and justice to all parties").

Courts have regularly emphasized that new trials are not vehicles to be used by a party "to 'plug the holes' of a case" unsuccessfully presented at the first trial. *Cleveland v. Piper Aircraft Corp.*, 985 F.2d 1438, 1450 (10th Cir. 1993). As the *Cleveland* court noted, "[i]t is always easy in hindsight for counsel to realize that there may be a better way to try a case the second time around." *Id.* at 1449. An important guiding principle here is whether the defendant had an adequate opportunity at the first trial of the action to present the additional evidence it now seeks to use for the first time at a second trial. Thus, in *Martin's Herend Imports, Inc. v. Diamond Gem Trading United States Co.*, 195 F.3d 765 (5th Cir. 1999), the Fifth Circuit affirmed the court's exclusion of new evidence from the defendant because the defendant had failed to provide "any explanation of why it did not offer it at the first trial." *Id.* at 775; *see also Total Containment, Inc. v. Dayco Prods., Inc.*, 177 F. Supp. 2d 332, 338-39 (E.D. Pa. 2001) (Schiller, J.) (excluding newly-proferred theories first offered at a second trial when the party "made a tactical decision not to do so at the prior trial.").

Here, defendants had ample opportunity to offer evidence in support of "deductible cost" categories other than the 25% reduction for producer commissions.  Defendants elected not to make a broader "deductible cost" claim.  For instance, in their pretrial memorandum, defendants listed certain income statements and balance sheets, for the 1998 through 2004 period (DTX 133-146), and identified a USI "consultant" named Joseph E. Wilson, Jr. as a person with knowledge about these expenses.  Defendants chose to not rely on this evidence, representing in writing that they had "decided not to present the testimony of Joseph Wilson or to seek to introduce the financial statements identified as Defendants' Exhibits 133 through 146 . . . at trial."  Ex. I, June 14, 2006 Letter from Zemaitis.[17]  This strategic decision – and defendants' broader decision to confine their deductible cost claim to only USI MidAtlantic producer commissions – should continue to bind the defendants during the damages retrial.  *See, e.g.*, *Total Containment,* 177 F. Supp. 2d at 338-39.

At the damages re-trial, defendants should not be permitted to present any evidence or argument in support of Section 504(b) "deductible costs" other than what was presented at the first trial – that is, a claim that the gross revenues received by USI MidAtlantic (only) should be reduced by 25% to account for producer commissions.

## CONCLUSION

For the reasons set forth above, The Graham Company respectfully requests that this Court grant plaintiff's motion and limit the scope of the jury issues to be decided at a second damages trial to a determination of the amount of "gross revenues," within the meaning of

---

[17]     Defendants' letter was prompted by The Graham Company's motion *in limine* to exclude this evidence for failing to meet the legal prerequisites for proving "deductible costs" under Section 504(b). *See* D.I. 101.  The defendants' letter mooted the motion.  In the event the Court does permit defendants to pursue broader deductible cost categories at the damages re-trial, The Graham Company would renew its prior motion *in limine* to exclude defendants' financial statement exhibits and Mr. Wilson's testimony.

Section 504(b) of the Copyright Act, that are attributable to infringements occurring after February 8, 2002.

Dated: July 10, 2007

WOODCOCK WASHBURN LLP

By:     /s/ David J. Wolfsohn

David J. Wolfsohn (Atty. ID # 57974)
Aleksander J. Goranin (Atty. ID # 92452)
Cira Centre, 12th Floor
2929 Arch Street
Philadelphia, PA 19104
(215) 568-3100

Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on July 10, 2007, a true and correct copy of the foregoing Plaintiff's

Pretrial Motion Concerning the Proper Scope of Jury Issues and Trial Presentations for the

Second Damages Trial, together with supporting materials, were served on the following in the

manner indicated below:

## By ECF Notification, Hand Delivery and Email

Thomas E. Zemaitis, Esquire
Pepper Hamilton LLP
300 Two Logan Square
18th and Arch Streets
Philadelphia   PA   19103-2799

## By Overnight Delivery and Email

Floyd Abrams, Esquire
Cahill Gordon & Reindel LLP
80 Pine Street
New York   NY   10005-1702

Attorneys for Defendants


  /s/ David J. Wolfsohn
David J. Wolfsohn